AUSA: Regina R. McCullough                Telephone: (313) 226-9618

Task Force Officer : Shawn Kotsch          Telephone: (313) 234-4000

AO 91 (Rev. 08/09) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Eastern District of Michigan

## ORIGINAL
53

United States of America,

Plaintiff,

v.

D-1  JOSEPH JAMES ROE,
D-2  DONALD COX,
D-3  DOROTHY COX,

Defendant(s).

Case: 2:15-mj-30418
Judge: Unassigned,
Filed: 09-03-2015 At 06:24 PM
CMP. USA v. SEALED MATTER (SO)

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief:

On or about the date(s) of  December 2012 to the present            , in the county of  Monroe and elsewhere
in the  Eastern                District of  Michigan              , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. Sections 846 and 841(a)(1) | Conspiracy to Distribute and Possession With Intent to Distribute Controlled Substances |

This criminal complaint is based on these facts:

☐   Continued on the attached sheet.

_____
Complainant's signature

Shawn Kotsch, Task Force Officer
Printed name and title

Sworn to before me and signed in my presence.

Date:  September 3, 2015

_____
Judge's signature

City and state:  Detroit, Michigan

Anthony P. Patti, United States Magistrate Judge
Printed name and title

# AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AND ARREST WARRANTS

I, Shawn M. Kotsch, Task Force Officer of the U.S. Department of Justice, Drug Enforcement Administration, Detroit, Michigan, being duly sworn, state the following:

1.      Your affiant is an investigative or law enforcement officer of the United States within the meaning of section 2510(7) of Title 18, United States Code, in that I am an officer of the United States, empowered by law to conduct investigations and make arrests for offenses enumerated in Title 18, United States Code, Section 2516.

2.   Your affiant is a Police Officer employed with the Dundee Police Department and has been so employed for approximately one and a half years.  Your affiant is currently assigned to the Drug Enforcement Administration (DEA), as a Task Force Officer and has been so employed since March 17, 2014.  Your affiant is assigned to investigate allegations of prescription drug diversion and health care fraud in and around the State of Michigan.  Your affiant received specialized training on the subjects of health care fraud, money laundering and telephone analysis from the DEA. Your affiant has been personally involved in investigations concerning

1

prescription drug diversion, health care fraud, and methods used to finance and conceal the profits of those operations. Your affiant has been to a 320-hour Military Police Investigator's Course, which consisted of a 40-hour narcotics training course. Additionally, your affiant has completed an 80-hour Military Drug Suppression Course and 80-hour Basic Narcotics Investigation Course hosted by the DEA. Your affiant, with other agents and officers, has met with local, state and federal law enforcement agents and officers in Tennessee and Kentucky to gather intelligence regarding the illegal trafficking of prescription narcotics from sources of supply in Michigan to drug dealers in Tennessee and Kentucky.

3.    This Affidavit is respectfully submitted in support of a complaint and arrest warrant for JOSEPH JAMES ROE, date of birth, March 31, 19XX, who resides at 2350 Yak Street, Monroe, MI;  DONALD COX, date of birth, May 9, 19XX , and DOROTHY COX, date of birth, December 20, 19XX, who both reside at 105 Currier Lane, Clinton, TN.  This request is based on probable cause that ROE, DONALD COX AND DOROTHY COX . Based upon the information set forth in this affidavit, your affiant has cause to believe and does believe that ROE, DONALD COX AND DOROTHY COX have violated Title 21, United States code, Sections 841(a)(1) and 846, Conspiracy to Distribute and Possession with the Intent to Distribute

Controlled Substances.

4.     This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not set forth all of my knowledge about this matter.

## SUMMARY OF THE ALLEGATIONS

5.     Based upon your affiant's training and experience, pharmaceutical prescription controlled substances are often illegally obtained, sold on the streets and abused by addicts (commonly referred to as "drug diversion"). The most commonly diverted prescription drugs throughout Michigan, Ohio, Kentucky and Tennessee are oxycodone hydrochloride, hydromorphone, amphetamine salt combo, morphine, and alprazolam.  These prescription drugs are often obtained from sources of supply in Michigan and trafficked to drug distributors in Ohio, Kentucky and Tennessee.  Through this and other investigations, your affiant has learned that the following prices can be attained through the illegal street sales of the above mentioned narcotics in Ohio, Kentucky and Tennessee:

A.     Oxycodone hydrochloride (30mg) - $30 - $50 per pill;

B.     Hydromorphone (4mg) - $50 per pill;

C.     Hydromorphone (8mg) - $75 per pill; and

3

D.      Methadone hydrochloride - $20 – $30 per pill.

Oxycodone hydrochloride, hydromorphone, amphetamine salt combo and morphine are all Schedule II controlled substances, as regulated by the DEA, due to the high potential for abuse and misuse.  The effects of oxycodone, hydromorphone and morphine based prescription medications are similar to the feeling of using heroin.  When abused or misused, it can result in death.  Alprazolam is a Schedule IV controlled substance, as regulated by the DEA, due to its moderate potential for abuse and misuse.  Alprazolam is considered a tranquilizer and respiratory depressant.  When alprazolam is consumed with a narcotic like oxycodone, it gives the consumer a high closer to the effect of heroin.  This greatly increases the risk of overdose and/or death.

6.    Since March 2013, your affiant, Special Agents and Task Force Officers of the DEA have been involved in an on-going investigation of JOSEPH JAMES ROE ("ROE") and other members of his Michigan-based drug trafficking organization, to include, DONALD COX, DOROTHY COX, and others.  The investigation has determined that ROE is the leader of a Drug Trafficking Organization (DTO) and is a large-scale distributor of prescription narcotics (i.e., oxycodone hydrochloride HCl, methadone HCl, and hydromorphone) in Michigan and Tennessee. Agents/Officers of DEA have received information from multiple sources that a doctor is writing

4

prescriptions for controlled substances without medical necessity and outside

the scope of professional practice. The patients (hereinafter referred to as

"target patients") who have been recruited by ROE, sell or trade their filled

prescriptions to ROE for cash and/or narcotics (e.g. crack cocaine or heroin).

ROE then distributes the prescription narcotics in the Metropolitan Detroit

area., Kentucky and Tennessee.

7.   The investigation has determined that ROE is the leader of a Drug

Trafficking Organization (DTO) and is a large-scale distributor of

prescription narcotics (i.e., oxycodone hydrochloride HCl, methadone HCl,

and hydromorphone) in Michigan, Kentucky and Tennessee. Agents/Officers

of DEA have received information from multiple sources that a doctor is

writing prescriptions for controlled substances without medical necessity and

outside the scope of professional practice. To obtain the prescription, ROE

recruit patients, (herein after "target patients") to see a specific doctor.  ROE

will orchestrate the "target patients" visits to the doctor by providing

transportation, payment for the office visit, and providing a "dirty urine

sample" in order to obtain prescriptions for medically unnecessary

controlled substances.  Once the prescription is filled, ROE then obtains the

controlled substances from the "target patients."  ROE then knowingly

diverts the controlled substances for illicit street sales in the Metropolitan

Detroit area, Kentucky and Tennessee.  Your affiant has identified DONALD

COX; DOROTHY COX ; and others as local distributors for ROE's DTO in

the Knoxville, Tennessee area.

8.     Throughout the course of this and other investigations, your affiant has

accessed the Michigan Automated Prescription System (MAPS) to analyze

prescription data and trends.  MAPS is an online database, maintained by the

Michigan Department of Community Health, which maintains a record of all

controlled substance prescriptions that have been written and filled at a

pharmacy within the state of Michigan.  MAPS is utilized by law

enforcement agencies to assist in their investigations.  Pharmacies are

required to input data into MAPS about the patient, prescribing physician,

pharmacy that filled the prescription and the details of the controlled

substances prescribed.

9.     Specific to this investigation, your affiant requested and reviewed the

MAPS data of the doctor utilized by ROE from November 8, 2013 to

November 7, 2014.  According to MAPS, the doctor prescribed 80 different

types of controlled substances for a total of 565,628 dosage units.  The most

frequently prescribed controlled substances were oxycodone hydrochloride -

75,041 dosage units; alprazolam (commonly referred to as Xanax) - 69,012

dosage units; methadone hydrochloride - 55,156 dosage units; and morphine

6

sulfate - 42,340 dosage units. Your affiant also reviewed the MAPS data for the doctor from December 2012 to August 2015, and ascertained the doctor prescribed 173,000 oxycodone hydrochloride dosage units and 59,671 dosage units of hydromorphone hydrochloride. Based on my training and experience, the analysis of the doctor's prescribing habits is a serious "red flag" in that the majority of his controlled narcotic prescriptions are that of the highly addictive and widely abused controlled schedule II and IV narcotics.

10.   During the investigation, your affiant has determined that at least five of the "target patients" recruited by ROE began receiving prescriptions from the doctor in approximately December 2012 and the "target patients" have received approximately 16, 077 dosage units of oxycodone hydrochloride 30 mg; 8,151 dosage units of hydrmorphone hydrochloride; 10,672 dosage units of oxycodone/APAP.

11.   As noted above, ROE obtains the prescription controlled substances from the target patients and knowingly distributes the prescription controlled substance in the Metropolitan Detroit area, Kentucky and Tennessee. Based upon your affiant's training experience, I am aware of the common street prices for prescription controlled substances issued to the target patients. It should be noted, these estimated street prices are not necessarily indicative of

street prices in Metro Detroit, but are more indicative of prices which can be

obtained in certain geographical locations, to where controlled prescription

substances are often diverted from the Metro Detroit area.

- 16,077 dosage units of oxycodone HCl, the estimated street value is $450,156.

- 8,151 dosage units of hydromorphone HCl, the estimated street value is $203,775.

- 10,672 dosage units of oxycodone/APA, the estimated street value is $106,720.

12.   Your affiant believes, based on the investigation to date, that ROE

utilizes the profits from the drug distribution to purchase multiple residential

properties in the Monroe, Michigan area.  ROE will renovate the properties

and rent them to various individuals in the Monroe, Michigan area; including

members of his DTO.  If is your affiant's belief that ROE is attempting to

conceal the true nature of his criminal activity by laundering the drug

proceeds through the purchase of various rental properties.

**BASIS OF INFORMATION**

13.   Your affiant makes this affidavit based upon personal knowledge

derived from my participation in this investigation and upon information I

believe to be reliable from the following sources: (a) my experience

investigating federal drug and money laundering offenses under Titles 18 and

21 of the United States Code; (b) oral and written reports and documents

8

about this investigation I have received from members of the DEA, local law enforcement, and other federal law enforcement agencies; (c) discussions I have had personally concerning this investigation with experienced DEA Special Agents, Diversion Investigators (DIs) and local law enforcement officers; (d) physical surveillance conducted by the DEA, and local law enforcement, the results of which have been reported to me either directly or indirectly; (e) public records; (f) telephone toll records, pen register and trap and trace information, and telephone subscriber information; (g) statements of confidential sources and sources of information; and (h) intercepts from a Title III.

## BACKGROUND

14. This investigation began on March 6, 2013 when a complainant (hereinafter complainant-1), who is employed as a pharmacist contacted the DEA and reported that a doctor was prescribing an excessive amount of controlled substances in large quantities. Upon being interviewed by a Diversion Investigator with the DEA, the complainant stated that s/he contacted the doctor on several occasions to discuss his prescribing habits based on concerns about both the volume and frequency of the prescriptions the doctor had written. The complainant indicated that s/he refused to fill controlled substance prescriptions written by the doctor because s/he did not

9

believe the patients actually needed the medication and the prescriptions appeared to be outside the normal parameters of treatment.

15. As a follow up, on March 27, 2013, the complainant-1 provided the DEA with four prescriptions, written by the doctor on March 15, 2013 to a single patient. The prescriptions were written for the following controlled substances: 390-count methadone (10mg); 450-count oxycodone (30mg); 60-count Adderall XR (20mg mixed amphetamine salts); and 300-count dilaudid/hydromorphone (8mg). Based on your affiant's training and experience, the above prescriptions are excessive and are indicative of those written outside the course of normal medical practice.

16. In addition to information from the complainant, in early February 2014, Special Agent (SA) Todd Kuehnlein received additional information from a different complainant (hereinafter referred to compalintnant-2) related to ROE and the doctor. Complainant-2 stated that Patient 1goes to the doctor on a monthly basis and receives Oxycodone pills without a medical condition. Complainant -2 further stated that s/he knows that Patient 1 takes additional people to see the doctor as well; however, the Complainant-2 did not know the names of these other "patients". Ccomplainant-2 stated that Patient 1 would transport hundreds of Oxycodone pills down to Kentucky and Tennessee and return with the proceeds in hidden compartments of his

10

vehicle.  The complainant stated that Patient 1, along with others, worked for ROE.

17.  That same day, SA Kuehnlein spoke with Monroe Area Narcotics Team and Investigative Services (MANTIS) Detective Rob Bow.  Detective Bow communicated that based on a MANTIS investigation, he was aware of an organization transporting Oxycodone pills from the Monroe, Michigan area to Kentucky and Tennessee, which involved both ROE and Pateint-1. Detective Bow further mentioned that Patient 1 would use either his personal vehicles to transport the pills and return with cash during these trips.

18.  Further, on February 12, 2014, SA Kuehnlein received a call from an anonymous caller who identified himself only as "Mike".  Mike stated that he wanted to pass along some information regarding a DTO; however, he wished to remain anonymous and did not provide any other personal information as the members of this DTO are known to be violent individuals. Mike stated that he was aware of an organization transporting hundreds of Oxycodone pills from the Monroe, MI area to Kentucky and Tennessee. Mike mentioned that he knew that Patient 1 obtained hundred-count Oxycodone pills from an unknown doctor on a monthly basis and transported the pills to Kentucky and Tennessee.  Mike went on to say that another member ROE's worked with Patient 1in the transportation of the pills and

11

both individuals worked for ROE.  Mike stated that Patient 1 resides in Monroe, MI and was unemployed.

19.   In May 2014, through criminal history checks, your affiant and other agents/officers became aware that on November 24, 2013,  a courier for ROE's DTO was charged with possession with intent to distribute schedule II controlled narcotics in Oak Ridge, Tennessee.  The courier was operating a gray 2011 Chevy Malibu, MI license plate CMU77877, which is registered to ROE.  The Chevy Malibu was impounded by the Oak Ridge Police Department and transported to the Oak Ridge Seizure lot located in a secure seizure area in Oak Ridge, Tennessee.  Your affiant believes, based on training and experience, that the courier was in Tennessee at the behest of ROE for the distribution of pharmaceutical controlled substances.

20.   Based on source information and the MAPS review, on June 25, 2014 at approximately 9:00 a.m., your affiant and other agents/officers initiated surveillance at Patient-1's residence as it was believed that Patient -1had a doctor's appointment day.  Your affiant and agents/officers determined Patient- 1 was not at the residence,  at approximately 9:05 am, agents/officers located Patient-1 gas Station on Dixie Highway near I-75 and observed Patient-1 enter a Blue Chevy Sonic, MI license plate CCJ 7834, registered to ROE.  Agents/Officers followed Patient -1 to the doctor's office which is

12

located in Oakland County, Michigan . At approximately 11:00 am, surveillance was terminated. At approximately 11:08 am, agents/officers reestablished surveillance at the doctor's office and observed Patient -1 arrive at the office driving the Blue Chevy Sonic mentioned above. Patient -1 was accompanied by Patient-2, the live-in girlfriend of ROE. During the physical surveillance, agents/officers observed Patient-1 enter the medical practice and a short time later, exit the practice and enter the above-mentioned vehicle with Pateint-2 in the passenger seat. Agents/Officers followed the individuals to a pharmacy in Wayne, Michigan. Agent/Officers observed Pateint-1 enter the pharmacy and a short time later, exit the pharmacy talking on his/her cell phone at approximately 1:14 p.m. The individuals traveled to a fast food restaurant and then returned to the pharmacy. Agents/Officers observed Patient-1 exit the vehicle and re-enter the pharmacy, and at approximately 1:47 p.m., Patient-1 exited the pharmacy talking on his/her cell phone and carrying a white bag, which your affiant believes, based on training and experience, contained controlled substances prescribed by the doctor. Agents/Officers followed the individuals to 121 Michigan Avenue, Monroe, Michigan. Agents/Officers observed Pateint-2 exit the vehicle carrying a white bag, which appeared to be the same bag Patient-1 placed into the vehicle after exiting the pharmacy. Agents/Officers

13

observed Patient-2 hand the white bag to ROE and they both entered the residence.

21.   Your affiant reviewed the MAPS report for the doctor who issued the prescriptions to Patient-1 and verified that on June 25, 2014, he prescribed Patient-1 84 morphine sulfate (100 mg), 168 oxycodone/acetaminophen (325 mg-10 mg), 28 diazepam (10 mg) and 168 oxycodone HCL (30 mg).  Your affiant further verified through MAPS that two of the prescriptions (morphine sulfate and oxycodone/acetaminophen  were filled at the above-mentioned pharmacy in Wayne., Michigan.  The additional prescription,  168 Oxycodone HCL, was filled on July 2, 2014.  Your affiant also noted that on June 24, 2014, the doctor also prescribed Patient-2 168 oxycodone hydrochloride (30 mg), 196 hydromorphone hydrochloride (8 mg), 140 methadone hydrochloride (10mg) and 84 alprazolam (2 mg), which were all filled on June 26, 2014.

22.   Your affiant has also found that ROE currently owns approximately 12 residential properties in the greater Monroe, MI area.  Investigators have found through open sources that almost all locations have been purchased by ROE and paid in cash.  The investigation has revealed that a majority of these locations have been converted and are currently utilized as rental properties.

23.   Your affiant is aware of numerous money laundering schemes in an attempt to make drug money appear to be legitimately earned.  Based on your affiant's training, experience and knowledge of the investigation thus far, Your affiant believes, based on training and experience, ROE is purchasing these properties with drug proceeds and then converting the properties into rental properties.  ROE then collects rent in the form of cash or check.  Thus, providing ROE with a form of legal income.

## PROBABLE CAUSE

24.   The information and facts set forth below establish probable cause to believe that the targets of this investigation are engaged conspiracy to distribute and conspiracy to possess with intent to distribute controlled substances in violation of 21 U.S.C. §841(a)(1) and 846.  This affidavit seeks to establish probable cause for the issuance of a criminal complaint and arrest warrants for JOSPEH JAMES ROE, DONALED COX and DOROTHY COX.

## INFORMATION PROVIDED BY SOURCES OF INFORMATION (SOIs)

25.   On June 28, 2014, your affiant and TFO Mike Guzowski conducted an interview with DEA SOI-2 at the Michigan State Police (MSP) Monroe Post in Monroe, MI.  SOI-2 stated that s/he was on parole out of Kentucky for

trafficking oxycodone pills. However, SOI-2 stated that since her/his arrest, SOI-2 is no longer involved with distributing prescription pills. Your affiant knows that SOI-2's arrest in Kentucky is unrelated to this investigation. SOI-2 stated that s/he deals in the distribution of cocaine, crack and heroin in the Monroe, MI area. Through his/her drug dealings, SOI-2 has had personal interactions with Patient-3 and knows that Patient-3 was seeing an unknown doctor to obtain controlled prescription pills. SOI-2 commented that Patient-3 does have substance abuse issues; and Patient-3 sells all of his controlled prescription pills to purchase heroin and crack cocaine from SOI-2. SOI-2 stated that s/he knows ROE personally and that s/he had heard through his/her interactions in the drug dealing world that ROE backed off a little in dealing with prescription pills and crack cocaine in fear of the police; however, SOI-2, without going into great detail, indirectly admitted that ROE is still actively dealing in illegal narcotics, including prescription pills, cocaine and crack cocaine.

26.    Your affiant and other agents/officers are unaware of any previous cooperation between SOI-2 and law enforcement; however, your affiant and other agents/officers have corroborated the information provided by SOI-2 through public databases, physical surveillance, interviews conducted with other individuals familiar with this organization and MAPS analysis.

Therefore, Your affiant believes, based on training and experience, SOI-2's information about members of ROE's DTO to be truthful and correct.

27.   On August 4, 2014, your affiant and SA Kuehnlein conducted an interview with a former employee of the doctor's practice (hereinafter SOI-3).  SOI-3 was employed by the doctor for an approximately six (6) month period in 2013.  SOI-3 was responsible for scheduling appointments, answering phones, collecting payments, managing patients' financial accounts with the office and handling patient files.  SOI-3 quit her/his employment with Dr. BUZZARD due to concerns of Dr. BUZZARD'S medical practice, including his prescribing habits.

28.   SOI-3 told investigators that he/she and other individuals employed by the doctor were also "patients" of his/her and received controlled prescription medications from him/her.  Your affiant reviewed 2013, 2014, and a portion of 2015 MAPS reports for SOI-3 and verified that s/he received four (4) prescriptions prescribed by Dr. BUZZARD that included two (2) prescriptions for Hydrocodone/APAP (7.5 mg/500 mg and 7.5 mg/325 mg) and two (2) prescriptions for Amphetamine Salt Combo (30 mg) from February 2013 through June 2013.  Additionally, your affiant noted that in 2013 SOI-3 received six (6) additional prescriptions prescribed by a different doctor that included four (4) prescriptions for Hydrocodone Bitartrate-

Acetaminophen (5 mg/325 mg) and two (2) prescriptions for Mixed Amphetamine Salts (10 mg) from March 2013 through November 2013. For the remaining 2014 and 2015 MAPS report, SOI-3 has only had four (4) total prescriptions written in her/his name.

29.   SOI-3 continued by stating that the cost of a patient's visit was based on the amount of controlled prescriptions prescribed during their visit – the more controlled prescriptions prescribed, the more the patient paid for their visit. SOI-3 stated that s/he suspected the doctor was receiving financial kick-backs from patients for prescribing the pharmaceutical prescription narcotics. SOI-3 advised that the doctor was a cash doctor and rarely accepted insurance from his/her patients. SOI-3 stated that the prices for patient visits varied. SOI-3 mentioned that the doctor would leave the office with at least $2,000-$3,000 U.S. Currency per day in an envelope.

30.   Your affiant and other agents/officers are unaware of any previous cooperation between SOI-3 and law enforcement; however, your affiant and other agents/officers have corroborated the information provided by SOI-3 through public databases, physical surveillance, interviews conducted with other individuals familiar with this organization and MAPS analysis. Therefore, your affiant believes, based on training and experience, that SOI-

18

3's information about members of ROE's DTO and their connection with Dr. BUZZARD is truthful and correct.

31.    In August 2014, your affiant interviewed an additional DEA Source of Information (hereinafter SOI-4).  SOI-4 is aware of the activities of ROE through SOI-4's contact and conversations with ROE and his associates. Your affiant is aware that SOI-4 previously provided information to MANTIS which was unrelated to this investigation, but corroborated with other information and deemed truthful by MANTIS.  Additionally, your affiant and other agents/officers have corroborated the information provided by SOI-4 through public databases, physical surveillance, interviews conducted with other individuals familiar with this organization and MAPS analysis.  Therefore, your affiant believes, based on training and experience, that SOI-4's information about members of ROE's DTO and their connection with the doctor is truthful and correct.

32.    SOI-4 advised your affiant that ROE recruits patients to be seen by the doctor, who has a medical practice in Oakland County, Michigan and s/he provided the names of six individuals, including Pateint-1, who pose as patients for ROE.  These individuals, including Patient-1, are prescribed controlled substances by the doctor outside the course of legitimate medical practice.  The individuals then sell their controlled substances to ROE for

19

money and/or narcotics. SOI-4 stated that a member of ROE's DTO was a courier for ROE and often transported pharmaceutical prescription narcotics to Tennessee for further distribution; however, SOI-4 stated that the individual was not currently working for ROE due to being arrested in Tennessee on two occasions and having an addiction.

33.   On August 18, 2014, your affiant conducted another interview with SOI-4. SOI-4 stated that on August 17, 2014, SOI-4 was at ROE's residence located at 2350 Yax St., Monroe, MI. SOI-4 stated that when s/he arrived, Patient-1, Patient-2, ROE, and others, were all present in the residence. SOI-4 stated that s/he spent the night on ROE's couch, and in the morning, ROE gave her/him $215 in cash and said it was for SOI-4's office visit fee with the doctor. According to SOI-4, ROE gave her/him the car keys to a Chevrolet Sonic that SOI-4 used to drive to the doctor. Your affiant believes, based on training and experience, the Chevrolet Sonic is the same vehicle referenced in the June 25, 2014 surveillance referenced above. SOI-4 stated that after completing her/his visit with Dr. BUZZARD s/he drove back to the Monroe, MI area and contacted ROE via cell phone. SOI-4 stated that ROE directed her/him to meet him (ROE) at the Hull Road Auto Parts located at 15278 Hull Rd., Monroe, MI to deliver the hydromorphone and oxycodone pills. SOI-4 stated that s/he met with ROE at the Hull Road Auto Parts and sold

20

her/his hydromorphone and oxycodone pills to ROE; however, SOI-4

commented that instead of being paid, ROE told her/him that he (ROE)

would put the $680 towards an outstanding debt that SOI-4 owed ROE.  SOI-

4 detailed to your affiant that ROE had bailed her/him out of jail earlier in the

month and that the bail was $1000.00.  Your affiant reviewed phone toll

information received on ROE's cell phone  and confirmed that SOI-4

contacted ROE on August 17 and 18, 2014.  Additionally, your affiant

requested and reviewed a MAPS report for the doctor on August 18, 2014

and verified that SOI-4 received the following pharmaceutical controlled

substance prescriptions during the office visit: 70-count 30mg oxycodone

hydrochloride; 84-count 60mg morphine sulfate; 70-count 8mg

hydromorphone hydrochloride; 56-count 10mg diazepam; and 28-count

50mg Lyrica.

34.   On August 30, 2014, your affiant received additional information from

SOI-2.  SOI-2 told your affiant that a courier for ROE's DTO traveled to

Tennessee in November 2013 at the behest of ROE to distribute pills and

collect money from the distribution of the pills.  SOI-2 indicated the courier

was driving a gray 2011 Chevy Malibu.  SOI-2 further indicated s/he was

aware there was approximately $40,000 in United States Currency hidden

inside the vehicle.  SOI-2 could not provide the exact location for the United

States Currency, but s/he indicated it was well hidden inside the vehicle. Your affiant believes, based on training and experience, the vehicle SOI-2 is referring to is the one that was used and seized by Oak Ridge Police Department on November 24, 2013 as referenced above.

35.   On October 13, 2014, your affiant was contacted by SOI-4.  SOI-4 advised your affiant that on or about October 12, 2014, while at ROE's residence, s/he overheard a conversation between ROE and another courier with ROE's DTO, wherein ROE asked the courier how the trip went.  SOI-4 did not hear the remainder of the conversation as ROE and the courier stepped outside of the residence.  SOI-4 further advised your affiant that s/he believes the courier had just returned from making an illegal prescription pill run down south.  SOI-4 provided the courier's cellular phone number to your affiant.  To verify SOI-4's information, your affiant requested, received, and reviewed phone toll information and noticed that the cellular phone being utilized by the courier was hitting off a network located in the area of Louisville, Kentucky during that timeframe.  Per the cell phone tolls, your affiant was able to corroborate the information obtained from SOI-4.

36.   On October 21, 2014, your affiant authored a federal search warrant for the gray 2011 Chevrolet Malibu, MI license plate CMU7787.  The Honorable United States Magistrate Judge H. Bruce Guyton, in the Eastern District of

Tennessee, signed the order authorizing the search. On October 22, 2014, investigators with the DEA and Tennessee State Police executed a search warrant on the 2011 Chevrolet Malibu. The execution of the search warrant took place at the impound lot located at Y12 Bear Creek Rd, Oak Ridge, Tennessee. Agents/Officers located $6,000.00 U.S. Currency under the interior panel of the vehicle's passenger side B-pillar (pillar that separates the front door and back door). The U.S. Currency was inside a black sock that was wedged into the vehicle's frame. The U.S. Currency had multiple multi-color rubber bands holding it together. Further search of the vehicle revealed approximately four more empty black socks and a number of other multi-colored rubber bands similar to the ones used to hold the located currency together. Your affiant believes, based on training and experience, that the $6,000 U.S. Currency was proceeds from the ROE DTO. At this point, investigators believe that neither ROE nor members of his DTO are aware that the money was seized from the vehicle due to the fact that the notification has been delayed up to this point in the investigation.

37.   On April 13, 2015, SOI-4 advised your affiant that s/he was seen by the doctor in Oakland County, Michigan on that same day. SOI-4 paid for the office visit with US Currency provided by ROE, after a cursory examination, the doctor prescribed several medications, including oxycodone HCl and

hydromorphone. SOI-4 filled the prescriptions at a pharmacy. SOI-4's activities on this date were not conducted at the direction of or under surveillance of any law enforcement agency.

38.   SOI-4 indicated after s/he left the pharmacy, drove to the Monroe, MI area and called ROE; ROE did not answer and the call went to voicemail. SOI-4 stated that s/he then call ROE on a different cellphone and made contact with ROE. According to SOI-4, ROE directed her/him to meet him at Hull Road Auto Parts. Once at Hall Road Auto Parts, SOI-4 met with ROE in the parking lot and sold him her/his hydromorphone and oxycodone pills.

39.   On April 21, 2015, SOI-4 contacted your affiant. SOI-4 advised your affiant that ROE intended to travel "down south" on April 27th and April 28th. SOI-4 advised that ROE would not leave for "down south' before he (ROE) purchased the prescription pills from SOI-4 on April 27th. SOI-4 advised s/he suspected ROE was taking illegal prescription pills with him on the trip "down south" to sell. Your affiant believes, based on training and experience, that ROE intended to meet with co-conspirators in his Drug Trafficking Organization on or around April 27, 2015 to April 28, 2015 in Tennessee.

40.   On April 26 2015, your affiant was notified by SOI-4 that ROE had left for his trip "down south".  SOI-4 advised that s/he stopped by ROE'S residence on April 26, 2015 and was informed that ROE had left on his trip. SOI-4 was told by Pateint-2 that ROE was travelling in a Grey Oldsmobile with two other individuals.  SOI -4 was unable to obtain any further information pertaining to the trip "down south" at that time.

41.   On April 27, 2015, in the Eastern District of Michigan, your affiant signed an affidavit in support of a search warrant for the location of Roe's cell phone through the use of GPS locator services.  On that that same day, the Honorable United States Magistrate Judge Elizabeth A. Stafford signed an order authorizing the search.

42.   On April 27, 2015, your affiant began receiving GPS cell phone pings forth cell phone being utilized by utilized by ROE.  The cell phone pings showed that ROE was in or around Clinton, TN.  Your affiant notified DEA Knoxville TFO Nathan Gibson and gave TFO Gibson SOI-4's description of ROE's vehicle being used on the trip (grey/tan Oldsmobile four-door) along with GPS coordinates for the cell phone.  TFO Gibson stated that he was familiar with the area and would head to the area to attempt to locate the target vehicle and/or ROE.

43.    At approximately 7:50 p.m., based on the description provided by your affiant, along with the GPS location of Latitude 36.113799 and Longitude 84.149802 (a 21-meter uncertainty), TFO Gibson was able to determine that the target vehicle and ROE were at 105 Currier Ln, Clinton, TN 37716.  TFO Gibson forwarded a photograph of the target vehicle to your affiant, who in turned, provided a copy to SOI-4.  SOI-4 advised that s/he was pretty sure it was the vehicle, but was not absolutely positive.  SOI-4 also informed your affiant that s/he overheard Patient-2 on the phone earlier in the day when s/he was at ROE's residence.  SOI-4 advised that s/he believed Pateint-2 was on the phone with ROE and mentioned the name "Donny."  SOI-4 advised that s/he believed Pateint-2 was referring to Donald COX, who was currently living in Tennessee.  Your affiant relayed the name Donald COX to TFO Gibson.  TFO Gibson advised that he had done an undercover buy from COX about a year or two ago and that one of his confidential informants purchased pills from COX as well.  TFO Gibson further advised that his former director was working a case involving COX in late 2012, early 2013.  According to TFO Gibson, information received from other law enforcement officers mentioned that COX was dealing with some "big shot" from the Detroit area named ROE.  TFO Gibson further advised your affiant that the area that ROE

26

was located is a high drug crime area, where a lot of illegal prescription pills are sold and used.

44. On May 14, 2015, your affiant was notified by Lt Mark Moore of the Michigan State Police (MSP) that an MSP Trooper had a vehicle with Tennessee plates stopped on I-75 in Monroe County. Lt Moore further advised that the occupants had $10,000 in U.S. Currency in their possession and admitted that they were headed to Hull Road Auto Parts. Through the course of this investigation, your affiant knows that Hull Road Auto Parts is the primary place of business for ROE and that according to sources of information is a location where ROE typically conducts his illegal narcotics transactions.

45. At approximately the same time, your affiant received an e-mail from Lt Moore that contained an informational bulletin distributed by the Ohio State Police Intelligence Unit. The bulletin disseminated information pertaining to a separate traffic stop conducted by the Ohio State Police (OHSP) approximately 2 hours prior to the MSP traffic stop. The bulletin identified a 1997 silver Honda Accord, TN license plate 632HHC, and Dorothy COX and Brice SHARP as the occupants in possession of $10,000 U.S. Currency.

46. On June 11, 2015, your affiant was able to meet with MSP Trooper Don Stewart. Trooper Stewart was the officer who conducted the stop on May 14,

27

2015 of the silver 1997 Honda Accord, Tennessee license plate 632HHC, registered to Conley SHARP of 204 Arcadian Springs Dr, Andersonville, TN 37705. Trooper Stewart advised that the Honda Accord merged onto I-75, and the driver failed to use a turn signal. Trooper Stewart identified the occupants as Dorothy Smith COX and Brice Franklin SHARP. According to Trooper Stewart, COX stated that they were recently stopped by OHSP and searched because of the large amount of money they had with them in the vehicle. Trooper Stewart advised that SHARP had approximately $10,000 in U.S. Currency in his back pocket. According to Trooper Stewart, the money was held together by a rubber band and was in a plastic bag. COX told Trooper Stewart that the money was from a Hardware Store owned by her father in Tennessee. Trooper Stewart told your affiant that he did not count the money but just thumbed through the currency. Furthermore, Trooper Stewart stated that he could not recall the currency being in high denominations. At the end of the encounter, both COX and SHARP were released at the scene with the U.S. Currency.

47.    Trooper Stewart commented that COX said they were from Tennessee and were going to take the car they were driving to Hull Road Auto Parts to get it looked at. COX further advised that they might purchase a Volkswagen Bug as well. Trooper Stewart noted that neither clothes nor

anything else was in the car.  COX advised that they were just going to be in Monroe for a couple of hours.  Trooper Stewart confronted COX and SHARP about their story as it was unusual to drive ten hours to Monroe to get car work done and buy another car.  COX advised Trooper Stewart that she has been good friends with Joseph ROE for about 20 years and that she and her husband, Donald COX, had moved to Tennessee about six years ago. Based on your affiant's training and experience with narcotics investigations your affiant knows that it is common for drug dealers to travel with large sums of U.S. Currency as payment for previous or current narcotics transactions.  Furthermore, your affiant knows that it is important for drug dealers to maintain contact before, during and after narcotics transactions to ensure success.  Additionally, your affiant knows that it is common for drug dealers to transport illegal narcotics to a destination for distribution, in this investigation Tennessee, and either transport or have the proceeds, U.S. Currency, transported for them in return.

48.   Trooper Stewart advised that COX commented that she travels to Monroe, Michigan about every two weeks.  For example, COX stated that she was in Monroe two weeks earlier to get a rear windshield for a Ford Explorer fixed by Joseph ROE.

### INFORMATION OBTAINED FROM UTILIZATION OF T-III INTERCEPTS

29

49.   As noted above, on July 28, 2015, the Honorable Victoria A. Roberts, United States District Court Judge, Eastern District of Michigan, authorized the interception of wire and electronic communications of JOSEPH JAMES ROE, and others, over cellular telephone number (734) 961-5998 (hereinafter **TT1**) and (734) 799-1940 (hereinafter **TT2**). Below is a synopsis of the some of the intercepted calls.

**Events Pertinent to ROE's Trip to Tennessee**

50.   On July 31, 2015, your affiant received information from a confidential informant (formerly SOI-4; hereinafter referred to as CI-1) that ROE intended to travel "down south" on Saturday, August 1, 2015 and he expected to return on Tuesday, August 4, 2015.  This information was corroborated through intercepted calls wherein ROE indicated he intended to travel "down south".

51.   On August 1, 2015, at approximately 12:11 am, Agents/Officers intercepted an incoming call between ROE and an individual bearing the the initials G.W.  ROE told G.W. to call him back in a half hour, because he was loading up the car and trying to hit the road.

52.   On August 1, 2015, at approximately 12:30 am, SA Kuehnlein established surveillance at ROE's residence (2350 Yax, Monroe, MI). At

approximately 1:11 am, SA Kuehnlein observed a tan/gold Buick,

MI/AQJ903, depart the residence. SA Kuehnlein followed the suspect

vehicle to southbound I-75 and terminated surveillance. During the course of

this investigation, your affiant has determined this vehicle is registered to

Joseph ROE ad 2350 Yax, Monroe, MI.

53.   On August 1, 2015, at approximately 1:27 am, Agents/Officers

intercepted an outgoing call between ROE and a female believed to be A.

LNU.  ROE advised A. LNU that he was heading down south and was

currently in Toledo. The call was active when connected to two separate cell

phone towers in the Toledo, OH area near I-75 indicating that ROE's cell

phone was in the Toledo, OH area and traveling south on I-75.

54.   On August 1, 2015, at approximately 7:47 am, Agents/Officers

intercepted an outgoing call between ROE and R. LNU. During the call,

ROE advised "I ain't at the state line yet, but just wanna let you know in case

you wanna make a few calls." R. LNU asked ROE if he had "3s," and ROE

responded that he had "3s, some footballs, and some Ds." R. LNU asked

ROE about the price for the 3s, and ROE responded with 28. R. LNU stated

"ok, yeah, I'm gettin on that right now" and asked ROE not to "run into

Donald and get rid of them all." ROE stated that he would not do that and

stated that Donald still owed him money from the last time. The two ended the conversation with agreeing to talk later.

a. Your affiant is aware through training, experience and personal knowledge with this investigation that ROE is utilizing code to describe the illegal prescription pills in his possession. Your affiant is aware that "3s" is oxycodone HCL 30mg, "footballs" is Alprazolam, and "Ds" is hydromorphone (the name brand being, Dilaudid).

b. Based upon the investigation to date, you affiant is aware that DONALD COX is a member of ROE's DTO and his position in the organization is to distribute prescription controlled substances which have been transported, by ROE or a courier, to the Tennessee area.

c. As noted during the call, ROE indicated that Donald (DONALD COX) owed him money. Based upon your affiant's training and experience, it is customary for drug traffickers to "front" controlled substances to a distributor. The drug trafficker will collect the proceeds after a later time. Your affiant believes that ROE "fronts" prescription controlled substances to COX and he delivers the proceeds to ROE at a later date, as noted in paragraphs 44-48 when DOROTHY COX was stopped by law enforcement in possession of $10,000 in U.S. Currency.

32

55. August 1, 2015, at approximately 9:11 am, Agents/Officers intercepted an outgoing call between ROE and R. LNU. During the call, ROE asked RHONDA where Donald was and she responded that she didn't know. ROE told R. LNU that he was at Hardees and that he had to "go get a place, a spot and then be able to get to my shit." R. LNU wanted to know how long it was going to take; indicating that she had people waiting. ROE stated that he was looking for Donald and went by her house looking for him (Donald) without finding him.

   d. Based on your affiant's training, experience, and familiarity with this investigation, it is believed that ROE advised R. LNU that it is difficult to get to the pills. Your affiant is aware that ROE often uses natural voids in a vehicle to conceal drugs and large amounts of currency. Your affiant believes, based upon this investigation, that ROE is very familiar with natural voids in vehicles because of his mechanical background.

56. On August 1, 2015, at approximately 10:27 am, DEA Knoxville Task Force Officer (TFO) Nathan Gibson traveled to the Clinton, TN area at the request of SA Todd Kuehnlein. TFO Gibson located the tan/gold Buick, MI/AQJ903, at 105 Currier Ln, Clinton, TN.

e.  Your affiant has determined, through information obtained from other open sources, current probation records, and surveillance,, that Donald COX and Dorothy COX reside at 105 Currier Lane, Clinton, TN 37776.

57.  On August 1, 2015, at approximately 11:32 am, Agents/Officers intercepted an outgoing call between Donald COX(utilizing ROE's cell phone) and R. LNU on TT2 (Call #257). During the call, COX confirmed with R. LNU that Jeremey wanted to purchase two pills.

58.  On August 1, 2015, at approximately 12:04 pm, Agents/Officers intercepted an incoming call between ROE and R. LNU.. During the call, R. LNU confronted ROE about inserting COX into their narcotics transaction. As noted during the call, R. LNU stated "cause I was gonna get sling, you know, sling 10 or 20 of them man now that's, that's all fucked up, because you (ROE) put stupid in it" referring to Donald COX.  R. LNU confirmed that she had people waiting to purchase the prescription controlled substances.  ROE stated that he would make his way back to R. LNU's place and indicated if she had sold the four tablets he previously provided then she could have re-upped. ROE and R. LNU discussed her mark-up price on each pill. R. LNU advised ROE that she didn't want to purchase pills from COX, as his price was higher.  RHONDA stated that she wanted to deal with ROE because his price is $28 per pill.

a.      Based upon your affiant's training, experience and familiarity

with this investigation, your affiant believes R. LNU negotiated a second

narcotics transaction and was concerned that ROE would require her to pay

a higher price by purchasing the pills from DONALD COX; thus reducing

her profit from the sale to a third party.

59.   On August 1, 2015, at approximately 12:17 pm, Agents/Officers

intercepted an incoming call between Donald COX (utilizing ROE's cell

phone) and R. LNU. During the call, R. LNU confirmed the Dollar Store as

the meeting location with COX.  COX asked R. LNU "how many you

getting." R. LNU stated "Ginger's wantin 6 or 8" and commented that ROE

was giving them to her for $28 and would make a $7 profit.  DONALD COX

and R. LNU discussed Claxton "being hot" and agreed to meet at a fruit

stand instead. DONALD COX commented that he and ROE were going

through Clinton now and would be there in 10 minutes; however, jokingly,

DONALD COX stated that he might have them all sold already.

a.      Based upon your affiant's training, experience and familiarity with

this investigation, your affiant believes R. LNU negotiated a third narcotics

transaction for 6 to 8 pills. Your affiant further believes both parties are

concerned about the presence of law enforcement in the area therefore they

changed the meeting location to a fruit stand. Your affiant is aware, via

35

intercepted phone calls, that Donald COX does not have an active cellular phone. Thus, Donald COX frequently used both of ROE's cell phones to arrange drug transactions throughout the Knoxville, TN area. During some of the intercepted phone calls; Donald COX and ROE could be heard in the background. Your affiant believes, based upon training and experience that ROE and Donald COX were together during most, if not all, of the drug transactions in the Tennessee area.

60.   On August 1, 2015, at approximately 7:39 pm, Agents/Officers intercepted an outgoing call between ROE and R. LNU. During the call, R. LNU accused ROE of "ripping" her off. R. LNU stated that ROE owed her 13 dollars. As noted during the call, R. LNU and ROE engaged in a heated discussion regarding the profit that R. LNU should have made from the sale of each pill. ROE advised R. LNU that he charged her $28 per pill; however R. LNU contended she was charged more because she "stomped on his (COX) feet."

a.   Based on your affiant's training, experience and familiarity with this investigation, your affiant believes, the person RHONDA is referring to as "Donald", is DONALD COX. Your affiant believes, based on training and experience that ROE is working directly with DONALD and DOROTHY COX in the Knoxville, TN area to distribute a large quantity of prescription

36

pills which ROE transported from Michigan. Your affiant further believes, based on training and experience that R. LNU believes she was shortchanged by ROE, because she insisted that DONALD COX be removed from their drug transaction, thus "stomping" on his drug profits.

61.   On August, 2, 2015, at approximately 12:13 am, Agents/Officers intercepted an outgoing call between ROE and Pateint-2. During the call, ROE indicated he was staying at Donald's house (DONALD COX). Additionally, Patient-1 advised ROE that Patient-3 and another individual were staying with him/her at the house. ROE told Patient-2 that Patient-5 would be coming over to pick- up get the VW, to drive to his/her appointment with the doctor.

a.      Based upon this investigation to date, your affiant is aware that ROE will direct "target patients" to pick up vehicles from his residence, 2350 Yax St, Monroe, MI, to drive to the doctor's office to obtain medically unnecessary prescriptions for controlled substances.

62.   On August, 2, 2015, at approximately 1:32 pm, Agents/Officers intercepted an outgoing call between ROE and Patient-2. During the call, ROE asked Patient-2 "did you give [him/her] a pill?" Patient-2 stated that he/she did not want to give him/her one of his/hers. Patient-2 stated that he/she had to make them last. ROE directed Patient-2 to a vehicle outside and

walked her through a sequence of steps to locate a pill bottle hidden in the car seat of vehicle parked at ROE's residence.  Patient-2 found the pill bottle and told ROE that there were nine pills located within the bottle along with an amount of cocaine. ROE stated that it was a 50, because he bought it. ROE told Paient-2 to give [him/her] one of the pills and to put the rest in the safe. Additionally, ROE told Patient-2 not to mess with any of the pills and that there had better be eight when he returned.

   a.     Based on your affiant's training and experience, your affiant believes that ROE stores prescription controlled substances and other illicit narcotics in vehicles parked at his residence. Moreover, ROE stores prescription controlled substances and other illicit narcotics inside a safe in the residence.  Your affiant believes that tPatient-2 described a $20.00/$30.00 value weight of cocaine.  ROE stated that purchased a 50, which your affiant believes is a $50.00 dollar bag of cocaine.  Your affiant is aware, from training and experience, that cocaine, heroin, and marijuana are commonly referred to in a dollar value rather than weight in the greater Monroe, MI area.

63.   On August, 2, 2015, at approximately 5:35 p.m., Agents/Officers intercepted an incoming between DONALD COX (utilizing ROE's phone0 and an unknown female. During the call DONALD COX asked the unknown

female if she knew anyone who wanted to purchase Roxie 30s and Dilaudid 8s. DONALD COX further advised the unknown female that he would sell the 30s for $30 and the K8 Dilaudid for $25. The unknown female indicated she would make a few call to ascertain if anyone wanted to purchase the prescriptions pills.

a.    Based on your affiant's training and experience, your affiant is aware that "Roxie 30" is the street name for Oxycodone 30 milligrams and "Dilaudid 8" is the brand name for Hydromorphone 8 milligrams. Your affiant believes, based upon training and experience that DONALD COX contacted the unknown female to negotiate a narcotics transaction.

64.  On August 2, 2015 at 5:37 p.m., agents/officers intercepted an incoming call between DONALD COX (utilizing ROE's phone) and T. LNU.  During the call, T. LNU inquired if DONALD COX had "quite a few of them" and DONALD COX responded that he did. T. LNU indicated he would call around and charge individuals $35 per pill so he could make a profit.

a.    Based on your affiant's training and experience, and familiarity with this investigation, your affiant believes that T. LNU inquired if DONALD COX had "quite a few" prescription pills for sale.  DONALD COX responded that he did.

39

b.     Based upon this investigation to date, your affiant is aware that DONALD and DOROTHY COX are members of ROE's DTO. Their role in the organization is to distribute prescription controlled substances in the Tennessee area, which have been transported from Michigan by ROE or one of his couriers.

65.   On August 2, 2015 at 5:41 p.m., agents/officers intercepted an incoming call between DONALD COX (utilizing ROE's phone) and T. LNU. During the call, T. LNU advised DONALD COX that he had a female who wanted to purchase a "guaranteed 10" and request DONALD COX deliver the 10 pills to him. DONALD COX agreed to meet T. LNU.

a.     Based on your affiant's training and experience, and familiarity with this investigation, T. LNU contacted DONALD COX to negotiate a narcotics transaction. T. LNU requested 10 pills and DONALD COX agreed to meet T. LNU to compete the narcotics transaction.

66.   On August 3, 2015 at 8:51 p.m., agents/officers intercepted a call between DOROTHY COX (utilizing ROE's phone) and an Unknown Male. During the call, DOROTHY COX advised the unknown male that they are down to 60. The unknown male indicated he would like to purchase 20; however he only had 400 and he believed the cost for 20 would be 58. The unknown male indicated he had "bought 60 in the last three days, two days."

DOROTHY COX offered to talk to him to and indicated she would text him with a response. The unknown male advised DOROTHY COX that 'he would have been holding about one hundred and twenty (120) if I hadn't done sixty (60) in the last two days." DOROTHY COX offered to meet the unknown male when he was ready.

a.      Based on your affiant's training and experience, and familiarity with this investigation, the unknown male and DOROTHY COX were trying to negotiate a narcotics transaction for 20 pills (oxycodone). Based upon training and experience your affiant believes DOROTHY COX intended to sell the pills for $29 for a total cost of $580. The unknown male made attempted to renegotiate the price and pay $400 for 20 pills. The unknown male reminded DOROTHY COX that he purchased 60 pills within the past two days and those had been distributed.  DOROTHY COX indicated she would talk to him (DONALD COX) about the unknown male's proposed offer of $400 for 20 pills.

b.      Based upon this investigation to date, your affiant is aware that ROE, travelled to the Tennessee area on August 1, 2015 and he, along with DONALD COX and DOROTHY COX, has been engaged in the distribution of prescription controlled substances.

67.   On August 4, 2015 at11:58 a.m., agents/officers intercepted a call between DOROTHY COX (utilizing ROE's phone) and an Unknown Female.  During the call, DOROTHY COX inquired if the unknown female needed anything, as "they are trying to hit the road and they got a few left." The unknown female inquired "what amount that they've got left?" DOROTHY COX responded "forty."  The unknown female replied, "forty? Well let me see what I can do for them. I'll try and get my boys."

a      Based on your affiant's training and experience, and familiarity with this investigation,  DOROTHY COX offered to sell forty pills to the unknown. DOROTHY COX indicated they were planning to leave the area and wanted to sale the remaining 40 pills. The unknown female offered to contact "her boys" to ascertain if she could find someone to purchase the 40 pills.

b.      Your affiant is aware, based upon the investigation to date, that ROE returned to the Metropolitan Detroit area on August 4, 2015.

68.   On August 4, 2015 at12:00 p.m., agents/officers intercepted a call between DOROTHY COX (utilizing ROE's phone) and an Unknown Male. During the call, DOROTHY COX advised the unknown male that she spoke to DONALD (DONALD COX) and he indicated "30 is the best we can do." The unknown male replied ok.

42

69.   On August 4, 2015 at 12:01 p.m., agents/officers intercepted a call between DOROTHY COX (utilizing ROE's phone) and Tony LNU.   During the call, DOROTHY COX advised Tony LNU to contact her when he had his money, "because there trying to hit the road they've got just a few left and they are trying to get rid of them. " Tony LNU replied '. I will probably take ten 910) of them, if they've got it?" DOROTHY COX advised him to contact her when he had the money in hand.

a.      Based on your affiant's training and experience, and familiarity with this investigation, during the call, DOROTHY COX negotiated a narcotics transaction with TONY LNU for 10 pills.

70.   On August 5, 2015, at approximately 4:29 pm, Agents/Officers intercepted an incoming call between ROE and Patient-2. During the call, ROE and Patient-2 discussed her upcoming doctor's appointment.  The two discussed whether Patient-2 would be required to pay for the office visit and if she would actually see the doctor. Patient-2 stated that she paid $40.00 for each prescription and $150.00 dollars for the office visit.

### Events Pertinent to Patient'-2's Visit with the doctor

71.   On August 5, 2015, at approximately 5:58 pm, Agents/Officers intercepted an incoming call between ROE and Patient-4.  Patient-4 asked ROE if he had any "IRs" and that he needed two right now. Patient-4 stated

that if ROE gave him two he would give him (ROE) three later. Patient-4

confirmed that he was "going" (to the doctor's office) in approximately

seven days. ROE stated that he was all out, but he would have some (IRs)

tomorrow after Patient-2's office visit..

a.  Based upon your affiant's training and experience, your affiant is

aware that "IRs", is code for Oxycodone Immediate Release. Your affiant

further believes that Patient-4 contacted ROE to negotiate a narcotics

transaction for two Oxycodone 30 milligram tablets. Your affiant believes,

based on training and experience and familiarity with this investigation, that

ROE intends to obtain Patient-2's Oxycodone HCl prescription when he/she

returns from his/her appointment with the doctor.

72.  On August 7, 2015, at approximately 12:20 pm, your affiant and

agents/officers established physical surveillance at the doctor's office in

Oakland County, Michigan. Your affiant observed a gold/tan Buick pull into

the parking area located at the office. SA Kuehnlein watched as the same

vehicle pulled in front of the doctor's suite. SA Kuehnlein noted that a

Patient-2, got out of the front passenger's side and entered the suite occupied

by the doctor. SA Kuehnlein observed the gold Buick as it departed the area.

A short time later, your affiant confirmed the license plate of the gold/tan

Buick as MI/AQJ903, which is registered to ROE.

73.   On August 7, 2015, at approximately 3:00 pm, TFO Marc Moore observed a gold/tan Buick arrive at pharmacy in Monroe, MI. TFO Moore observed the gold/tan Buick pull through the drive-through window with the driver handing the employee paperwork. As the gold/tan Buick departed the area, the vehicle turned south on N Monroe Street. Surveillance on the vehicle was terminated at that time.

74.   On August 7, 2015, at approximately 3:16 pm, Agents/Officers intercepted an incoming call between ROE and Patient-2.  During the call ROE inquired her how much money Pateint-2 had left. Patient-2 responded that he/she had to count it first but that he/she gave them (the doctor's office) $250.

a.     Your affiant believes, based upon training and experience this call confirms that ROE is paying the costs associated with the doctor visit for his "target patients".

75.   On August 7, 2015, at approximately 5:33 pm, SA Kuehnlein observed the gold/tan Buick depart 2350 Yax St, Monroe, MI.  At approximately 5:36 pm, your affiant observed Patient-2 driving the gold/tan Buick on Cole Street heading towards N Monroe Street.  At approximately 5:39 pm, TFO Robert Blair observed the gold/tan Buick arrive at the pharmacy and drive up through the drive-through window. At approximately 5:42 pm, TFO Blair

observed an employee handing Patient-2 a white bag and Patient-2 departed

the area. At approximately 5:49 pm, your affiant observed the gold/tan Buick

turn onto Yax towards her residence. Shortly after that, SA Kuehnlein drove

by 2350 Yax St, Monroe, MI and observedPatient-2 KOLVER exiting the

gold/tan Buick at 2350 Yax St, Monroe, MI.

76.   Your affiant obtained a MAPS report pertaining to the prescriptions

Patient-2 received on August 7, 2015.  Your affiant found that Patient-2

received and filled the following:

- 84 Dosage Units of Oxycodone HCL 30mg

- 119 Dosage Units of Hydromorphone HCL 8mg

- 70 Dosage Units of Methadone HCL 10mg

- 42 Dosage Units of Alprazolam 22mg

**Events Pertinent to Patient-5's Visit with the doctor**

77.   On August 25, 2015, at approximately 10:55 am, Agents/Officers

intercepted an incoming call between ROE and Patient-5. During the call,

Patient-5 stated "I gotta be up there today at 1:30, uh, [she's/he's] in the

office." Patient-5 asked ROE, "You want me to get ahold of you later?" ROE

stated, "Yep, soon as you get out." Patient-5 then stated she/he needed a

"piece of a blue one to throw in the pee." ROE indicated that he had a pill

with him. Patient-5 responded "Uh, I'll be up at the junkyard then with Brad (LNU) when he comes to get me then ok?" ROE then stated, "Yeah, but you gotta call me back cause I got to make sure the owner ain't there you know."

   a.      Your affiant believes, based on training and experience that Patient-5 advised ROE of his appointment to ascertain if ROE wanted to buy his prescription pills. ROE indicated he wanted to purchase the pills. Your affiant believes, based upon training and experience and familiarity with this investigation that Patient-5's reference to a "piece of a blue one to throw in his pee" indicates Patient-5 required an Oxycodone HCL pill to put in his urine for the drug screen administered by the doctor. Your affiant is aware that the doctor routinely conducts urinalysis drug screens and will issue prescriptions if patients test positive for illicit controlled substances, such as heroin or cocaine.   ROE then indicated he would be at the "junkyard" (Hull Road Auto Parts).

78.   On August 25, 2015, at approximately 1:45 pm, TFO Sarah Buciak established surveillance along with members of MANTIS (Monroe Area Narcotics Team Investigation Services) at the doctor's office in Oakland County, Michigan. TFO Buciak observed an older model green Buick with a front license plate in royal blue with "Jesus" in yellow lettering parked in the

47

parking lot of the doctor's office occupied by one white male with a buzzed haircut sitting in the driver-side seat leaning to the side, smoking.

79.   On August 25, 2015, at approximately 2:49 pm, TFO Buciak observed a white male with dark hair wearing a white- and red-checkered long-sleeved shirt with a red undershirt exit the doctor's office and walk towards the older model green Buick with a cigarette in his left hand. TFO Buciak then observed the white male, later positively identified as Patient-5 enter the front passenger side of the green Buick. The driver then backed out and departed the area where TFO Buciak and members of MANTIS began moving surveillance. TFO Shawn Street obtained the plate MI/BEC2912, a database check revealed the vehicle is not registered.

80.   On August 25, 2015, at approximately 3:52 pm, TFO Buciak observed the driver of the green Buick arrive at a pharmacy in Monroe, MI; TFO Buciak observed the driver park in the lot and Patient-5 exit the vehicle holding white papers in-hand and walk into the pharmacy..

81.   On August 25, 2015, at approximately 3:56 pm, TFO Buciak observed Patient-5 exit the pharmacy empty-handed and enter back into the passenger side of the green Buick then depart the vicinity.

82.   At approximately 4:34 pm, TFO Buciak observed the same green Buick return to the pharmacy and Patient-5 exit the vehicle and walk into the pharmacy.

83.   On August 25, 2015, at approximately 4:38 pm, TFO Buciak observed Patient-5  exit the pharmacy, enter into the front passenger side of the Buick, then depart the vicinity.

84.   On August 25, 2015, at approximately 4:47 pm, TFO Buciak observed the Buick arrive on Hull Rd, where SA Kuehnlein, by electronic surveillance (pole camera) , confirmed the green Buick pulled into the lot of Hull Road Auto Parts, 15278 Hull Rd, Monroe, MI.

85.   On August 25, 2015, at approximately 4:51 pm, SA Kuehnlein observed the Buick depart Hull Road Auto Parts, 15278 Hull Rd, Monroe, MI.

86.   On August 25, 2015, at approximately 4:58 pm, TFO Sarah Buciak observed the Buick return to the pharmacy and observed Patient-5 exit the passenger side of the vehicle, and walk into the pharmacy. At approximately 5:05 pm, TFO Buciak observed Patient-5 exit the pharmacy and enter the passenger side of the Buick, where it then departed the vicinity.

87.   On August 25, 2015, at approximately 5:11 pm, TFO Street observed the Buick drive down Hull Road where SA Kuehnlein, observed via electronic surveillance, the green Buick pulled in the lot of Hull Road Auto Parts,

49

15278 Hull Rd, Monroe, MI at the curve of the driveway where it pulled

driver-side-window-to-driver-side-window with another vehicle, a gold

Chevrolet S-10 bearing MI/026G358 with a black/burnt orange trailer

bearing MI/C630812 (registered to ROE).

88.   On August 25, 2015, at approximately 5:14 pm, SA Kuehnlein observed

the truck with trailer, green Buick, and a silver Ford pickup bearing

MI/AFD7980 depart the vicinity.

89.   On August 25, 2015, at approximately 5:18 pm, TFO Street observed the

gold Chevrolet S-10 with a black/burnt orange trailer pull into a gas station

on Monroe Street. TFO Street observed ROE exit the driver side of the

Chevrolet S-10.

90.   Based on your affiant's training, experience, and familiarity with the

investigation, your affiant believes, based on training and experience, that

Patient-5 and ROE engaged in a hand-to-hand transaction at Hull Road Auto

Parts.  Your affiant believes, based on training and experience, and

familiarity with this investigation, that Patient-5 sold his prescriptions to

ROE.

91.   Your affiant obtained a MAPS report pertaining to the prescriptions

Patient-5 received on August 25, 2015.  Your affiant found that Patient-5

received and filled the following:

- 84 Dosage Units of Oxycodone HCL 30mg

- 112 Dosage Units of Hydromorphone HCL 8mg

## CONCLUSION

92.   Based upon the forgoing, your affiant asserts that probable cause exists

that ROE, DONALD COX, and DOROTHY COX have committed

conspiracy to distribute a controlled substance, and conspiracy to possess

with intent to distribute a controlled substance in violation of Title 21 United

States Code, Sections 841(a)(1) and 846.

## REQUEST TO SEAL

93.   It is respectfully requested that this Court issue an order sealing, until

further order of the Court, all papers submitted in support of this application,

including the application and search warrant.  I believe that sealing this

document is necessary because the items and information to be seized are

relevant to numerous ongoing investigations into criminal organizations as

not all of the targets of this investigation, or related investigations, will be

searched at this time.  Based upon my training and experience, I have learned

that online criminals actively search for criminal affidavits and search

warrants via the Internet, and disseminate them to other online criminals as

they deem appropriate, e.g., post them publicly online through the carding

forums.  Premature disclosure of the contents of this affidavit and related

documents may have a significant and negative impact on the continuing

investigations and may severely jeopardize their effectiveness.




Shawn Kotsch
Task Force Officer
Drug Enforcement Administration

Sworn and subscribed to before me on this 3rd day of September, 2015.



**ANTHONY P. PATTI**
**UNITED STATES MAGISTRATE JUDGE**

52